**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

Jackie A.,[1]

                                    Plaintiff,                    5:19-CV-00375 (BKS)

v.

ANDREW SAUL,[2] Commissioner of Social Security,

                                    Defendant.

_____

**Appearances:**

_For Plaintiff:_
Lawrence D. Hasseler
Conboy, McKay, Bachman & Kendall, LLP
307 State Street
Carthage, New York 13619

_For Defendant:_
Antionette T. Bacon
Acting United States Attorney
Sarah E. Choi
Special Assistant United States Attorney
Social Security Administration
J.F.K. Federal Building, Room 625
Boston, MA 02203

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Jackie A. filed this action under 42 U.S.C. § 405(g) seeking review of a decision

by the Commissioner of Social Security denying Plaintiff's application for Social Security

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect her privacy.

[2] Andrew Saul became the Commissioner of Social Security after this case was filed. Pursuant to Federal Rule of Civil Procedure 25(d), the Clerk of the Court is directed to add his name to the docket.

Disability Insurance ("SSDI") Benefits. (Dkt. No. 1). The parties' briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 10, 14). After carefully reviewing the Administrative Record,[3] (Dkt. No. 7), and considering the parties' arguments, the Court reverses the Commissioner's decision and remands this matter for further proceedings.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff applied for SSDI benefits on September 17, 2012, alleging a disability onset date of June 22, 2012. (R. 111). The Commissioner denied the claim on November 8, 2012. (R. 57-62). Plaintiff appealed that determination, and a hearing was held before Administrative Law Judge Patrick Flanagan ("ALJ Flanagan") on October 8, 2013, at which Plaintiff was represented by counsel. (R. 25-55). On March 27, 2014, ALJ Flanagan issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 11-13). Plaintiff filed a request for a review of that decision with the Appeals Council, which denied review on April 5, 2016. (R. 1-3). The Northern District of New York reversed and remanded the Commissioner's decision on December 14, 2016, following a stipulation for remand by both parties. (R. 387-388). The Appeals Council vacated the final decision of the Commissioner and directed the Commissioner to provide Plaintiff with "the opportunity for a hearing, [to] take any further action needed to complete the administrative record, and issue a new decision." (R. 396).

Plaintiff was granted a new hearing held before Administrative Law Judge Elizabeth W. Koennecke ("ALJ Koennecke") on January 3, 2018. (R. 317-336). On March 1, 2018, ALJ Koennecke issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 298-311). Plaintiff filed a request for a review of that decision with the

---

[3] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 7), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

Appeals Council, which denied review on March 1, 2019. (R. 288-291). Plaintiff commenced

this action on March 28, 2019. (Dkt. No. 1).[4]

### B.       Plaintiff's Background and Testimony

Plaintiff was 49 years old when she applied for SSDI benefits in September 2012. (R.

341-342). She has a high school education. (R. 120). Prior to applying for SSDI benefits,

Plaintiff previously worked as a store clerk and as a housecleaner. (R. 120, 341). After applying

for benefits, Plaintiff began volunteering at the SPCA as a requirement to receive benefits from

the Department of Social Services ("DSS"). (R. 320). After approximately a year of volunteering

at the SPCA for the DSS program, Plaintiff began getting paid by the SPCA in October 2014.

(*Id.*). Plaintiff worked there part-time until she left in September or October of 2016, when the

SPCA began "sending up bigger dogs and things [Plaintiff] couldn't handle." (R. 320-21). Prior

to her employment by the SPCA, Plaintiff had made an "unsuccessful work attempt" at the

Dollar Tree, Inc. (R. 439-41). She was terminated from this position on February 24, 2014, due

to her "inability to lift [and] stand." (R. 441). From October 2016 to September 2017, Plaintiff

worked part-time at Kmart, "[m]ainly in the clothing department doing stocking and

straightening." (R. 321-22). After Kmart closed, Plaintiff worked part-time at T.J. Maxx, where

she was still employed at the time of her hearing on January 3, 2018. (R. 322, 325).

---

[4] "An ALJ making a decision in a case on remand from the Appeals Council . . . is to consider the case *de novo* when the Appeals Council has vacated the ALJ's previous decision." *Uffre v. Astrue*, No. 06-cv-7755, 2008 WL 1792436, at *7, 2008 U.S. Dist. LEXIS 32080, at *20 (S.D.N.Y. Apr. 18, 2008) (citing Social Security Administration, Office of Disability Adjudication and Review, Hearings, Appeals, and Litigation Law Manual, I-2-8-18(A) ("When the AC vacates an ALJ decision . . . the AC will usually direct that the ALJ offer the claimant an opportunity for a new hearing and issue a new decision in the case.")). Accordingly, the Court reviews the entirety of Plaintiff's relevant medical history, as considered by ALJ Koennecke on remand.

### 1.   October 8, 2013 Hearing

At the October 8, 2013 hearing, Plaintiff testified that she is single and lives alone. (R. 345). She has a driver's license and drives every day, although it causes her pain. (R. 134, 136, 137, 345-346). Plaintiff testified that she does her own grocery shopping but needs assistance to carry anything heavy. (R. 355-356). She is not very active. (R. 355). She used to "like to go to the races, but sitting on the bleachers for too long bothers [her]." (*Id.*). Plaintiff watches NASCAR races on television on the weekend. (*Id.*) She used to own and ride a motorcycle, but sold it because she "knew [she] wasn't going to be able to handle driving it." (R. 360-61).

Plaintiff's neck and left shoulder pain began when she picked up a mattress "five [or] six years ago and it pulled my neck and shoulder muscle." (R. 356). Plaintiff wakes up in pain once a week and has "to get up and walk and set up in the chair for a while." (*Id.*) Plaintiff does exercises given to her by a physical therapist at home twice a day. (R. 357). The most she lifts with her left hand is five pounds. (R. 357-58). When she uses her left arm too much, her neck and left shoulder "get[] aching really bad and feel[] like it's on fire." (R. 358). Plaintiff had two prior surgeries on her right shoulder, for which she was previously awarded a closed period of disability. (R. 344, 358). She can lift fifteen pounds with her right arm, but due to her prior surgeries she will "pay for it" if she overdoes it. (R. 358). Plaintiff's work at the SPCA leaves her feeling sore. (R. 358-359). She may feel "okay" when she starts the day, but by the end of the day she is "paying for it." (R. 359.). By the end of the work week, she is sore when she starts the day. (*Id.*). Plaintiff has a computer at home, but only uses it once a week for approximately an hour because her neck starts bothering her. (R. 362). She could no longer continue her prior job as a housecleaner because she could not physically do the "vacuuming and mopping, sweeping, cleaning all the bathrooms down, and dusting." (R. 347).

**2.    January 3, 2018 Hearing**

At the January 3, 2018 hearing, Plaintiff provided further testimony. Plaintiff left her job at the SPCA because they began asking Plaintiff to take care of "bigger dogs and things that [she] couldn't handle." (R. 321). Plaintiff then worked at Kmart, "mainly in the clothing department doing stocking and straightening." (*Id.*). The "lifting and carrying requirements" when she worked at Kmart were "usually twenty pounds or under." (R. 326). She then worked at T.J. Maxx, where her job entailed "mainly stocking" but also "bedding things and knickknacks and that kind of stuff." (*Id.*). She could not work at the cash register because "the repetition of lifting everything at the register would bother" her shoulder. (R. 325). The lifting and carrying requirements at T.J. Maxx were "usually under twenty pounds" but if she had to lift or carry anything heavier, Plaintiff would "get somebody else to do it or help." (R. 327). Plaintiff has had to decline work from both T.J. Maxx and Kmart due to "medical reasons." (R. 323). When she was working at the SPCA, "there was nobody to fill in" so she "just went in hurting." (*Id.*). Plaintiff's neck and left shoulder give her the most pain, although she does have some pain in her right shoulder. (*Id.*) Plaintiff testified that she felt her condition improved from 2012 until 2014, and then began to deteriorate in 2015 to where "it feels like it's starting to go to where its tore and bothering me worse again." (R. 324-325).

**C.    Medical Evidence and Opinions**

**1.    Samaritan Medical Center**

On June 25, 2012, Plaintiff presented at the Samaritan Medical Center with "intermittent shoulder pain." (R. 186). She reported that it began after an injury four years earlier, and that she had pain at least once a week. (*Id.*). The pain was in the "left scapular area" and was a "6 out of 10 on a pain scale." (*Id.*). Plaintiff was diagnosed with an "acute myofascial strain" and given prescriptions for Ibuprofen and Tramadol before being discharged. (R. 186, 188).

On July 9, 2012, Plaintiff returned to the Samaritan Medical Center because she "woke up…with increased pain." (R. 193). She reported her pain was a "7 out of 10," and radiographs were taken of her cervical spine. (R. 194). The radiographs revealed "no acute fracture or instability with flexion or extension" but "minimal posterior marginal spurring [was] noted at C4-5." (*Id*.). Plaintiff was diagnosed with a "cervical sprain – suspect DJD." (R. 195). She was prescribed Flexeril and Tramadol. (R. 194).

On August 27, 2012, Plaintiff was referred to North Country Orthopaedic Group for a physical therapy evaluation and treatment of her neck pain and left shoulder pain. (R. 202). On August 8, 2012, Plaintiff indicated during physical therapy that her pain began "around June 17th" and was in her "neck" and "left shoulder." (R. 204). She rated her pain a six out of ten on the pain scale, and reported that it was "always aching" and there was sometimes a "sharp pain." (*Id*.). Her goal for physical therapy was to "get back to work." (*Id*.). In her evaluation, the physical therapist noted that Plaintiff had pain during her left shoulder flexion, extension, and abduction. (R. 206). It was noted that while she had decreased strength in her left shoulder flexion, abduction, and extension, the rest of her strength and range of motion was within normal limits. (*Id*.). She had full sensation. (R. 207). Her symptoms were found to be consistent with a "nerve compression in neck causing shoulder pain." (*Id*.). Plaintiff's listed short-term goals were improved posture and decreasing her pain while driving. (*Id*.).

Plaintiff received physical therapy again on August 10, 2012, where she reported increased pain as a result of driving. (R. 208). On August 14, 2012, Plaintiff reported her pain was "getting better" and that she had "almost no pain over the weekend." (R. 209). On August 17, 2012, she was "just a little sore in the left shoulder since [the] last treatment" and reported no pain at the end of the physical therapy session. (R. 210). On August 21, 2012, Plaintiff was sore

as a result of doing "a lot of driving" the day prior. (R. 211.). On August 24, 2012, in a summary of Plaintiff's progress directed to P.A. Schultz, the therapist noted that Plaintiff had "shown overall [decreased] pain in neck and [] shoulder, although she has had a couple of exacerbations of her pain." (R. 212). On the same day, Plaintiff reported her pain was "not bad." (R. 213). On August 31, 2012, the physical therapist noted that Plaintiff "would benefit from [an] MRI" of her shoulder and that there may be separate neck and shoulder issues. (R. 215).

On September 7, 2012, Plaintiff reported that she was "less sore than Wednesday but still does have some irritation from usage in shoulder." (R. 217). On September 18, 2012, Plaintiff mentioned that she "still occasionally get[s] severe pain when [she] moves wrong." (R. 220). On September 21, 2012, Plaintiff complained of pain of a two out of ten in her neck, and a four out of ten on her left shoulder on a pain scale. (R. 221). On September 28, 2012, Plaintiff reported that her pain was "better until [the] morning" and her therapist noted that she was "plateauing." (R. 222). On her final visit on September 29, 2012, her therapist noted that Plaintiff still has significant pain at the end of her range of motion. (R. 223).

On April 16, 2014, Plaintiff had a consult with Melissa Saxton, F.N.P, at the Samaritan Medical Center Pain Clinic ("Pain Clinic"). (R. 522). She reported a pain that "aches" in her neck, left shoulder, and left scapula area. (R. 521). "Pulling, reaching, and lifting" all increased her pain. (*Id*.). Heat and ice relieved the pain. (*Id*.). She was working "despite" the pain. (*Id*.).

Plaintiff reported that she had pain in her "neck and left shoulder" that began eight years ago but began getting worse on June 24, 2012. (R. 541). Her pain "usually increases as [the] day goes on but really hits when done and [she tries] to relax." (*Id*.). Her stated goal from treatment was to "ease [the] pain so [she] can go back to work." (R. 543). She reported her last day of work was June 24, 2012 and that she had "always done physical work" so she was "trying to find

something [she could] do that has jobs in this area." (R. 547). She was volunteering at the SPCA through a social services program. (R. 548). Plaintiff felt physical therapy had helped her regain movement and strength in her arm but had "really stopped providing her any relief at this point." (R. 551). On physical examination, Plaintiff had some generalized muscle weakness on her left side. (R. 552). "Range of motion of the neck" increased Plaintiff's discomfort, and examination of Plaintiff's cervical spine showed "trigger points and tight fibrous muscle banding through the cervical paraspinal muscles, infraspinatus muscles, trapezius, and scapular muscles." (R. 552-53). Range of motion of the left shoulder also increased pain. (R. 553). Nurse Saxton provided preoperative instructions for the cervical epidural and prescribed Plaintiff Tizanidine. (*Id*.).

On May 13, 2014, Plaintiff had a follow-up visit with Nurse Saxton. (R. 566). Plaintiff cancelled her scheduled cervical epidural because "she got nervous regarding the epidural and wanted to wait until her pain was really bad before she actually has it done." (*Id*.). Plaintiff was "quite happy with tizanidine" and felt she could manage her pain appropriately with tizanidine, which had helped with the "pain and spasm in her neck" and "lowered her headaches quite a bit as well." (*Id*.). Nurse Saxton instructed Plaintiff to continue with the tizanidine, and to book a cervical epidural at any point. (R. 567). On July 14, 2014, Plaintiff continued to report "that with using tizanidine, she has had very good control of her pain." (R. 578). Nurse Saxton opined that Plaintiff was "doing well." (R. 579).

Plaintiff returned on August 26, 2014 and reported her pain as a five out of ten. (R. 591). She was working part-time at the SPCA, which Plaintiff felt had "actually been helpful for her pain because she gets out and moving around." (*Id*.). Plaintiff reported increased pain on April 10, 2015 from "dealing with an extra dog" at the SPCA. (R. 612). She felt like her "muscles are all knotted up." (*Id*.). Nurse Saxton discussed doing trigger point injections, which Plaintiff

declined at that time. (R. 613). On August 18, 2015, Plaintiff reported to Nurse Saxton that the tizanidine did not seem "to be working as well as it had." (R. 625). Plaintiff requested a change in medication but noted that her pain seemed to be "better." (*Id*.). Nurse Saxton prescribed baclofen, and Plaintiff once again declined to schedule trigger point injections. (R. 626). Plaintiff treated with Lynn Barber, N.P., on June 14, 2016, at the Pain Clinic for continued care of her neck and shoulder pain. (R. 657). She had attended physical therapy for eight weeks with no relief. (*Id*.). Nurse Barber instructed Plaintiff to continue with her current medication. (R. 658). She saw Nurse Barber again on August 12, 2016, where Nurse Barber "reviewed interventional options" which Plaintiff was "not interested" in pursing. (R. 660). Nurse Barber discharged Plaintiff from the Pain Clinic and instructed her to follow up with her primary care doctor. (*Id*.).

### 2.      North Country Orthopaedic Group, P.C.

On July 16, 2012, Plaintiff saw Barry Schultz, P.A. at North Country Orthopaedic Group. (R. 224). Plaintiff explained that "a few weeks back, she was experiencing some shoulder pain" and that "when she went to bed one night [she] woke up the next morning" and was unable to "abduct or forward flex her shoulder past 45 degrees." (*Id*.). She had been "feeling better gradually and regaining her range of motion." (*Id*.). Plaintiff described having "issues previously with her neck" and seeing a "chiropractor regularly for the last couple of years." (*Id*.). On physical examination of the cervical spine and left shoulder, P.A. Schultz noted tenderness to palpation over the "paraspinal musculature on the left side of her cervical spine." (R. 225). Plaintiff had "full, active range of motion in the cervical spine." (*Id*.). P.A. Schultz noted "tenderness to palpation over the medial border of the scapula on the left" and "tenderness to palpation over the supraspinatus and infraspinatus muscles." (*Id*.). He also noted "tenderness to palpation over her lateral scapula border" as well as "along the course of the upper and middle trapezius." (*Id*.). Plaintiff had "full, active range of motion at the left shoulder…with the

exception of internal rotation." (*Id*.). P.A. Schultz noted that Plaintiff's strength was "5/5 throughout bilateral upper extremities in all places through the shoulder, elbow and wrists" but that she does "experience pain with her active range of motion at the limits of all motions with the left shoulder." (*Id*.). The "cross arm abduction on the left produced painful stretch between the medial border and the scapula and thoracic spine." (*Id*.). P.A. Schultz reviewed the radiographs taken at the Samaritan Medical Center and concurred with the radiologist's report. (*Id*.). He found that there was "no fracture seen" but there was "some cervical degenerative disc disease in the lower cervical and upper thoracic spine." (*Id*.). P.A. Schultz's impression was that Plaintiff suffered from "left upper trapezius and parascapular musculature overuse syndrome." (*Id*.). P.A. Schultz recommended physical therapy, and that the therapist "instruct her in stretching and strengthening to help work this out and prevent exacerbations in the future." (*Id*.). He also prescribed Mobic and recommended magnetic resonance imaging (an "MRI") if Plaintiff did not feel better at her next appointment. (*Id*.).

Plaintiff followed up with P.A. Schultz on August 1, 2012. (R. 227). Plaintiff reported that the anti-inflammatory medication prescribed by P.A. Schultz was not "doing much good" and that she was still having difficulty in her "left shoulder and neck region." (*Id*.). Plaintiff reported that the pain became "worse as the day goes on" and that by the evening, she experienced "pretty significant throbbing." (*Id*.). Plaintiff requested a "disability slip to provide for social security." (*Id*.). P.A. Schultz taught Plaintiff some "simple stretching exercises" and increased her medication to twice daily. (*Id*.). He also added Zanaflex before bed. (*Id*.). Plaintiff "was given a disability slip" as P.A. Schultz determined that she was not able to do her current job as a housecleaner due to "her left shoulder dysfunction." (*Id*.).

On August 28, 2012, Plaintiff saw P.A. Schultz again. (R. 228). She reported that she had been attending physical therapy, and that while her pain seemed to be "improving some," she was back in pain "by evening time" although "it is not as severe as it used to be." (*Id*.). P.A. Schultz mentioned "the possibility of a corticosteroid injection in the AC joint" or the "subacromial space" but Plaintiff wished "to hold off on that and see how she does with a good stent [sic] of physical therapy." (*Id*.). Plaintiff was also given a "disability slip to stay out of work until further notice." (*Id*.).

On October 30, 2012, Plaintiff underwent an MRI of her left shoulder with and without contrast at the direction of P.A. Schultz. (R. 229). Based on the findings on the MRI, Dean Phillips, D.O., diagnosed Plaintiff with a complex labral tear and mild supraspinatus tendinitis/tendinopathy. (*Id*.). On November 6, 2012. Plaintiff met with P.A. Schultz to follow up after her MRI. (R. 247). P.A. Schultz concurred "with the radiologist report that there is a complex labral tear involving the posterior aspect of the labrum from A to P." (*Id*.). P.A. Schultz also noted that there was "some fraying in the superior aspect of the labrum" and "some increase[d] signal was noted in the supraspinatus tendon" but "otherwise no muscle belly atrophy or retraction of the supraspinatus." (*Id*.). Given the MRI results, P.A. Schultz referred her to a surgeon, Dr. Choung, for an evaluation for "surgical correction." (*Id*.).

Plaintiff was referred to Edward N. Powell, M.D., an orthopedic surgeon at North Country Orthopaedic Group for management of her complex labral tear. (R. 248). On December 3, 2012, Plaintiff met with Dr. Powell and on physical exam presented with "mild tenderness to palpation about the AC joint as well as the anterior aspect of her shoulder." (*Id*.). Plaintiff had both active and passive decreased range of motion. (*Id*.). Dr. Powell reviewed the results of Plaintiff's MRI performed on October 30, 2012, but disagreed with the radiologist's and P.A.

Schultz's diagnosis of a "complex labral tear about the superior labrum." (*Id.*). Instead, Dr. Powell noted that Plaintiff had a "slap tear and some dye into her biceps anchor however this does not seem to be a complex tear." (R. 248-49). He further opined that she had "more of a type 2 slap tear" with "decreased overall volume size of her shoulder" and "reduction of her capsular tissue especially about the inferior capsule." (R. 249). Dr. Powell diagnosed Plaintiff with "left shoulder adhesive capsulitis with a transition from stage 2 to stage 3." (*Id.*). He recommended she continue physical therapy and predicted that Plaintiff "would be moving on to a phase where she had very minimal pain but just a stiff shoulder." (*Id.*).

On January 14, 2013, Plaintiff met with Dr. Powell, who noted that she was "more of a stage III type of frozen shoulder with a frozen shoulder and not really complaining of much pain." (R. 250). Plaintiff reported that she had "gained more motion about her shoulder." (*Id.*). On physical examination, Plaintiff did not have "tenderness on palpation about the AC joint and bicipital groove." (*Id.*). Her range of motion had improved "slightly" from her previous examination, "especially [the] external rotation, as well as the abduction and forward elevation." (*Id.*). Dr. Powell noted that while Plaintiff did have a "questionable tear about the superior labral" he believed it was "secondary to her adhesive capsulitis at this time." (*Id.*).

On February 26, 2013, Plaintiff met with Dr. Powell and complained of "more soreness about her left shoulder" although her "range of motion ha[d] improved." (R. 251). Dr. Powell noted that while Plaintiff had "made a lot of progress in regards to her left shoulder in regards to active motion" she had "started developing more pain about her left shoulder." (*Id.*). Plaintiff also complained of "progressive problems with her right shoulder." (*Id.*). Dr. Powell instructed Plaintiff to continue to work on exercises at home but noted that she did not need "any further formal physical therapy" and instead they would wait to "see if the pain gets any better." (*Id.*).

Dr. Powell opined that Plaintiff might have "a small tear about her superior labrum that may be somewhat symptomatic," and that if she continued to have discomfort, he would recommend injecting her "glenohumeral joint to see if it improves her pain." (*Id*.). Plaintiff reported that she was unable to continue her previous work cleaning houses because it would "necessitate repetitive motion"; and Dr. Powell noted "[s]he would like to stay out of work at this time and we will keep her out of work." (*Id*.).

On June 14, 2013, Plaintiff saw P.A. Schultz for neck pain. (R. 252). Plaintiff wanted "to have her cervical spine evaluated to see if it is contributing to her bilateral shoulder difficulties." (*Id*.). She complained of "a lot of left-sided cervical muscle pain, as well as some intermittent numbness over the lateral aspect of her left upper extremity." (*Id*.). Plaintiff reported pain of a five out of ten on a pain scale, and indicated on a diagram that the "cervical spine and the left posterior shoulder region" was the "problem area." (*Id*.). On physical examination, P.A. Schultz noted increased muscle tone in the "paracervical musculature" as well as tenderness to palpation in the same region, with increased tenderness on the left side. (R. 253). An X-Ray showed no "fractures, dislocations, or bony lesions." (*Id*.). It did reveal "diffusive degenerative changes" of the entire cervical spine including "spondylosis, anterior vertebral body lipping and degenerative facet changes." (*Id*.). P.A. Schultz diagnosed Plaintiff with "degenerative joint disease of the cervical spine" and "left upper extremity cervicalgia." (*Id*.). He recommended beginning with a conservative therapy, including an anti-inflammatory and muscle relaxer as well as physical therapy. (*Id*.).

On April 16, 2013, P.A. Schultz filled out a "Medical Report for Employability" form for Plaintiff. (R. 275). Under diagnosis, he wrote "left shoulder complex labral tear" and indicated that Plaintiff's physical impairment could be expected to last twelve months or more. (*Id*.). He

checked "no" to indicate that Plaintiff could not "participate in work or work activities." (*Id*.). For her restrictions, P.A. Schultz denoted no work-hour limitations, and no restriction on walking, standing, sitting, or bus travel. (*Id*.). He restricted her from all lifting, carrying, pushing, pulling, climbing, stooping, and bending. (*Id*.). He did indicate that with treatment, Plaintiff had "the potential to recover from [her] physical impairment sufficiently to enable a return to work" and indicated her "anticipated return to work date" was May 1, 2013. (*Id*.).

On August 9, 2013, Plaintiff saw P.A. Schultz for her neck and left shoulder issues. (R. 279). She felt that therapy had not helped her neck, and that "two days ago she went ahead and did her dishes and did some housecleaning" which increased her pain "significantly for the last two days." (*Id*.). Plaintiff appeared to be in no acute distress and was able to achieve "full active range of motion in the shoulder." (*Id*.). She was "tender to palpation posteriorly in the parascapular musculature." (*Id*.). P.A. Schultz ordered an MRI, with the possibility of proceeding with trigger point injections depending on the results of the MRI. (*Id*.). Plaintiff had the MRI on August 22, 2013, which showed "a broad based disc protrusion at C6-7 with cranial extension." (R. 278).

On August 16, 2013, P.A. Schultz filled out a second "Medical Report for Employability" form, this time denoting it was for Plaintiff's diagnosis of "cervical degenerative disc disease." (R. 276). P.A. Schultz indicated that while Plaintiff's impairment could be expected to last twelve months or more, she could participate in "work or work activities today." (*Id*.). P.A. Schultz denoted no work-hour limitations, but restricted Plaintiff to minimal pushing, pulling, and climbing and moderate stooping and bending. (*Id*.). He also limited her to lifting or carrying a fifteen pounds. (*Id*.). He indicated that with treatment, Plaintiff had "the potential to recover from [her] physical impairment sufficiently to enable a return to work." (*Id*.). He noted

that her recommended treatment included "trigger point injections" in her cervical spine region. (*Id*.).

On August 28, 2013, Plaintiff saw P.A. Schultz for a follow-up after undergoing a cervical spine MRI. (R. 281). P.A. Schultz concurred with the radiologist's impression of "broad base disc protrusion at C7 with cranial extension but no neuroforaminal encroachment." (*Id*.). He further noted that there was some "uncovertebral spurring at 4-5 that produces some mild right neuroforaminal encroachment" but "no further abnormalities.". (*Id*.). Plaintiff reported no change in her pain, and that she was "only able to do any upper extremity activity in short stents [sic] and then she has to rest for a period of time." (*Id*.). Plaintiff was having "difficulty keeping her house clean." (*Id*.). A physical exam revealed tenderness to palpation along the "medial scapular border," "the left middle trap," and the "insertion of the levator scapula on the scapular." (*Id*.). She had decreased range of motion in her left upper extremity and her neck due to pain. (*Id*.). P.A. Schultz found this to be consistent with cervical degenerative disc disease and "left shoulder parascapular muscle dysfunction." (*Id*.). He recommended she undergo trigger point injections and referred her to a physiatrist. (*Id*.). P.A. Schultz filled out a "disability certificate" indicating that plaintiff had "con't partial disability" and should not lift or carry "greater than 15 pounds." (R. 277). P.A. Schultz noted that there was "no change to her impairment status of temporary partial impairment with the restriction of no lifting or carrying greater than 15 pounds." (R. 282).

On September 19, 2013, Plaintiff saw Michael C. Wainberg, M.D., M.Sc., a physiatrist with North Country Orthopaedic Group. (R. 283). Plaintiff relayed that she had been experiencing left shoulder paid for over a year and was also experiencing pain in her neck. (*Id*.). On physical examination, Dr. Wainberg found no "obvious vasomotor nor atrophic changes in the upper extremities." (*Id*.). He did note "subtle but definite weakness for left digit extension,

left pronation, and left elbow extension." (*Id*.). His differential diagnosis included "left cervical radiculopathy versus discogenic etiology versus left glenohumeral etiology." (*Id*.). He recommended "electrodiagnostic studies of the upper extremities," which he would use to recommend further intervention. (R. 284). On October 23, 2013, Plaintiff underwent a nerve conduction study. (R. 285-86). She followed up with Dr. Wainberg to discuss the findings of the electrodiagnostic studies. (R. 287). Plaintiff reported that she had been working at the SPCA, and while she appeared to "generally be able to tolerate it," she did experience "pretty substantial pain symptoms at the end of the day" at least once a week. (*Id*.). The electrodiagnostic studies showed evidence of a "chronic left C6-7 radiculopathy." (*Id*.). Dr. Wainberg recommended a course of "cervical epidural injections" and "depending on her clinic response" "other interventions versus possibly a surgical consultation." (*Id*.). Dr. Wainberg advised her to continue with her "current activity restrictions though she understands that if she is running into a lot more difficulty that she should come back in for reevaluation." (*Id*.).

On March 11, 2014, Plaintiff was seen by Dr. Wainberg. (R. 503). She had previously been prescribed prednisone for the pain but did "not really find that it made a substantial difference overall in her pain symptoms." (*Id*.). On physical examination, Plaintiff exhibited "subtle weakness for left digit extension." (*Id*.). Dr. Wainberg referred Plaintiff to a pain clinic for epidural injections, and noted that if "these are not adequately effective then [he] would anticipate surgical referral." (*Id*.). He also filled out a "disability certificate" restricting her from lifting or carrying anything greater than five pounds. (R. 663). On June 17, 2014, Plaintiff treated with Dr. Wainberg. (R. 504). Plaintiff had declined to receive epidural injections but had still received treatment at the pain clinic. (*Id*.). Dr. Wainberg discussed a "surgical consultation," but Plaintiff declined "that at present." (*Id*.).

### 3.      Elke Lorensen, M.D.

Plaintiff met with Dr. Lorensen for a consultative internal medicine examination on November 2, 2012. (R. 230). Plaintiff reported a "primary complaint" of "pain that is located in the upper part of her arm" and that "radiates posteriorly to her back, in between her shoulder blades." (*Id*.). Plaintiff also complained of "a pain on the lateral aspect of her left neck" that is "made worse when she reaches and lifts with the left arm." (*Id*.). The pain is "sometimes accompanied by paresthesias in the left arm and in the left hand." (*Id*.). She denied any trouble holding on to small objects. (*Id*.). Plaintiff reported two prior surgeries: in 1991 and 1993 for two separate surgeries on her right shoulder. (*Id*.). As part of her daily living, Plaintiff reported "light cooking" seven days a week, "a little bit" of cleaning, laundry two to three times a week, and shopping one to two times a week. (*Id*.). She showers and dresses herself daily, and watches television, "listens to the radio, and reads." (*Id*.).

On physical examination, Plaintiff appeared to be no in acute distress and exhibited a normal gait. (R. 231). She could walk "on heels and toes without difficulty," squat in full, had a normal stance, and did not use any assistive devices. (*Id*.). She required no help changing for the exam or getting on or off the table and was able "to rise from [the] chair without difficulty." (*Id*.). Plaintiff's cervical spine showed "full lateral flexion and full rotary movements bilaterally" with fifteen degrees of extension. (R. 232). She did not show signs of "scoliosis, kyphosis, or abnormality in [the] thoracic spine." (*Id*.). Her "lumbar spine show[ed] flexion [of] 50 degrees, "extension [of] 15 degrees" and "lateral flexion and rotation" of "15 degrees bilaterally." (*Id*.). Plaintiff's "left shoulder forward elevation and abduction" were "75 degrees." (*Id*.). She had full range of motion in the right shoulder, right elbow, and both forearms and wrists. (*Id*.). Her joints were "stable and nontender" with "no redness, heat, swelling, or effusion." (*Id*.). Plaintiff's "hand and finger dexterity" was intact with a "5/5" grip strength bilaterally. (*Id*.). Dr. Lorensen

diagnosed plaintiff with "left shoulder pain" and "neck pain" and gave her a "fair" prognosis. (*Id*.). She found "moderate to marked restrictions with pushing, pulling, and reaching with the left shoulder" as well as "moderate restrictions bending and lifting." (*Id*.).

### 4. M. Whittle, M.D.

On November 7, 2012, Dr. Whittle conducted a record review in connection with Plaintiff's original disability determination. (R. 234). Dr. Whittle noted a primary diagnosis of "degenerative changes of c-spine" and a secondary diagnosis of "overuse syndrome of left shoulder." (*Id*.). He noted exertional limits of occasionally lifting or carrying twenty pounds, frequently lifting or carrying ten pounds, standing or walking for a total of six hours, and sitting for about six hours. (R. 235). He also noted that Plaintiff was "limited in upper extremities" with her ability to "push and/or pull." (*Id*.). Due to Plaintiff's limited left shoulder range of motion and inability to elevate or abduct "beyond 75 degrees, due to pain," Dr. Whittle restricted her to limited reaching in all directions, including overhead. (R. 236). Dr. Whittle did not find his conclusions about Plaintiff limitations or restrictions to be significantly different from any of the "treating/examining source conclusions." (*Id*.).

### 5. Nata Parnes, M.D.

Plaintiff treated with Dr. Parnes on April 18, 2013 for her neck pain and left shoulder pain. (R. 245). She reported experiencing the pain for nine months, and it interrupted her sleep. (*Id*.). She had received physical therapy and had a "cortisone injection to the shoulder." (*Id*.). Plaintiff complained of "neck pain, which radiates down and to the left." (*Id*.). On physical examination, Dr. Parnes found that Plaintiff did not appear to be in any acute distress and the skin of her left shoulder was intact with no muscle atrophy. (R. 246). Plaintiff had tenderness "over the trapezius muscle and left paraspinal muscle on her thoracic level." (*Id*.). She had a "strongly positive Spurling test" but negative "Belly-press test," "Yokum test," "Hawkins test,"

"Speed test" and "O'Brien test." (*Id*.). Dr. Parnes reviewed Plaintiff's MRI and recommended that she "be referred to a neck specialist for further evaluation and treatment of the neck." (*Id*.). Dr. Parnes noted that Plaintiff reported that she was "progressing nicely" in physical therapy for her shoulder and recommended that she continue physical therapy for her shoulder. (*Id*.).

   **6.**  **Johnna Wagoner Covey, M.S.P.T.**

   Plaintiff began receiving physical therapy from Covey on April 19, 2016. (R. 505). The "treating diagnoses" were listed as "cervicalgia" and "radiculopathy, cervical region." (*Id*.). Plaintiff reported that she experienced "constant neck pain to left shoulder" with "pain into [the] shoulder blade area" and that "work [at the SPCA] irritates it." (*Id*.). Plaintiff described her pain level at rest as a four out ten on a pain scale, and as a seven out of ten at its worst. (*Id*.). Covey noted that Plaintiff had a "moderate impairment" in the range of motion in Plaintiff's shoulder abduction, and "mild impairment" in her shoulder extension. (R. 506). Plaintiff also had mild weakness in her shoulder strength and reported driving was difficult because it was "painful to turn [her] head." (*Id*.). Covey assessed Plaintiff with "decreased functional mobility secondary to neck pain with radiculopathy left" which was "not responding mechanically." (*Id*.). Covey's goals for Plaintiff included an "80% recovery" in twelve weeks, decreased pain, and increased range of motion. (*Id*.).

   On April 22, 2016, Plaintiff continued physical therapy with Covey. (R. 507). She reported pain in the left side of her "C5" but that the pain in her scapula was "not too bad right now." (*Id*.). Her current pain level remained unchanged, but she rated her more severe pain slightly lower than during her prior visit. (*Id*.). Plaintiff returned on April 26, 2016 and reported that she "felt pretty good after [the] last session for a couple of days." (R. 508). Covey noted that Plaintiff was "responding well at this time to manual therapy for reduction of symptoms." (*Id*.). On April 29, 2016, Plaintiff noted that she had been "just a little sore after last time" but that she

had gotten "some groceries and lifted something" so it may have been "a combination of things." (R. 509). On May 3, 2016, Plaintiff "report[ed] soreness after last session." (R. 510). She continued to report the same overall pain levels as she had during her second visit. (*Id.*). On May 6, 2016, Plaintiff noted that her pain "wasn't as bad after last session" and that she had "avoided SB stretches and retraction" to give "the neck a chance to settle down a little." (R. 511). Covey noted that she was discontinuing "SB stretches or retraction" because Plaintiff was not responding to them, and now Plaintiff seemed to be improving with "posture correction, supine strengthening and manual therapy." (*Id.*). Plaintiff reported lower pain levels, with her current pain a two or three out of ten, and her more severe pain a four or five out of ten. (*Id.*). On May 10, 2016, Plaintiff reported that she been "sore between [her scapula] after new strengthening" exercises, "but only for a day." (R. 512). Covey determined that Plaintiff was responding "best to manual therapy," but would like to "reinstate strengthening next time." (*Id.*).

On May 13, 2016, Plaintiff noted that she was "not significantly more" sore than usual and Covey opined that Plaintiff "tolerated treatment well." (R. 513). On May 20, 2016, Plaintiff reported a "10% recovery" and that she still suffered from "constant neck pain to shoulder" that occasionally went down her arm to her elbow. (R. 515). Work aggravated her pain, as did "lifting, reaching overhead, looking up or down for a long period of time," and mopping. (*Id.*). Covey continued to note mild to moderate weakness in Plaintiff's strength and mild to moderate impairments in her range of motion. (R. 515-16). Plaintiff treated with Covey again on May 24, 2016, at which time Covey noted "no overall change." (R. 517). On May 27, 2016, Covey reported that Plaintiff had "made some progress, but continues with constant neck and left shoulder pain with occasional radiating symptoms down her arm." (R. 519). Plaintiff "continues to work cleaning which requires a lot of lifting and carrying and twisting." (*Id.*). Covey noted

that Plaintiff had not met two out of three of her treatment goals, including improved range of

motion and "80% recovery." (*Id.*).

### D.   Hearing Testimony from Vocational Expert

At the January 3, 2018 hearing, vocational expert ("VE") Joseph Atkinson agreed that

Plaintiff did not have past relevant work. (R. 330). ALJ Koennecke then gave VE Atkinson the

following scenario:

> I want you to consider an individual 48 to 53 years old with a high
> school education and no past relevant work. All right, so this
> individual has the residual functional capacity to perform light work
> which is defined as 20 pounds occasionally, ten pounds frequently,
> stand and walk for six, sit for six, except this person could sit, stand
> or walk without limitation. On the left non-dominant side they can
> lift and carry, push and pull up to 15 pounds frequently and then as
> to occasionally ten pounds consistent with light work. There are no
> lifting or carrying restrictions on the right arm. On the non-dominant
> arm there should be occasional reaching overheard but no restriction
> in reaching, handling, fingering or feeling on either side. Can the
> individual I described do any work or are there any jobs you can
> name?

(R. 331). VE Atkinson replied that the Plaintiff could work as an "information clerk," "cashier

II," and "office helper," all of which were light work. (R. 331-32). The ALJ then asked "[w]hat if

this person on the non-dominant side . . . lifting and carrying was reduced to five pounds

frequently?" (R. 333). VE Atkinson replied that it would not have an effect on the information

clerk position, but estimated it would reduce the availability of cashier and office helper jobs by

"30 to 40%," "but would not eliminate the occupation." (*Id.*). The ALJ then asked VE Atkinson

to define the job of someone "who works in a retail store and they are doing things like stocking

the shelves, hanging up clothes, bringing out items to be stocked generally at most – well and

everything would be under 20 pounds." (*Id.*) VE Atkinson replied that it would be "stores,

laborer" and is "medium work in the general economy" but "light as [] described." (R. 334).

### E.       The ALJ's Second Decision Denying Benefits

On March 1, 2018, ALJ Koennecke issued a decision denying Plaintiff's claim. (R. 298).

In reaching that conclusion, the ALJ applied a "five-step sequential evaluation process for

determining whether an individual is disabled."[5] (R. 299). The ALJ's analysis at each step is

summarized below.[6]

### 1.       Steps One, Two, and Three

At step one, the ALJ determined that Plaintiff had engaged in substantial gainful activity

"during the last quarter of 2014, all of 2015 and through the 3rd quarter of 2016."[7] (R. 301).

However, she found that between "the alleged onset date of June 22, 2012 and December (the

4th quarter) of 2014, and beginning with October (the 4th quarter) of 2016, there were

continuous 12-month period(s) during which the [Plaintiff] did not engage in substantial gainful

activity." (R. 302). Therefore, the ALJ's findings address the periods the Plaintiff did not engage

in substantial gainful activity. (*Id.*).

At step two, the ALJ determined that Plaintiff had the following severe impairment: a

neck impairment and a "left shoulder (non-dominant) impairment." (*Id.*). At step three, the ALJ

---

[5] Under the five-step analysis for evaluating disability claims:

> [I]f the commissioner determines (1) that the claimant is not working, (2) that he
> has a severe impairment, (3) that the impairment is not one listed in Appendix 1
> of the regulations that conclusively requires a determination of disability, and (4)
> that the claimant is not capable of continuing in his prior type of work, the
> Commissioner must find him disabled if (5) there is not another type of work the
> claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

[6] As an initial matter, the ALJ determined that Plaintiff "meets the insured status requirements of the Social Security Act through December 30, 2021." (R. 301).

[7] Plaintiff does not contest that she was engaged in substantial gainful activity during this period.

found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.*).

### 2. Plaintiff's Residual Functional Capacity (RFC)

Because Plaintiff's impairments did not meet or equal a listed impairment at step three, the ALJ then assessed Plaintiff's RFC.[8] The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's statements concerning "the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 305).

In support of the finding and the overall RFC, the ALJ outlined specific items in Plaintiff's medical and treatment history, and assigned the following weights to the various medical opinions contained within the record regarding Plaintiff's physical limitations:

1. The ALJ accorded "significant evidentiary weight" to the "findings of Dr. Wainberg, with regard to the restrictions imposed by PA Schultz and further supported by the consultative examiner." (R. 306). In October 2013, Dr. Wainberg, a physiatrist who treated Plaintiff for her neck and left shoulder impairment, noted that Plaintiff "should continue with her current activity restrictions" which the ALJ concluded "would correlate with the August 2013 assessment from PA Schultz limiting the [Plaintiff] to lifting/carrying no more than 15 lbs. with her left upper extremity." (*Id.*).

2. The ALJ found "no evidentiary value" in P.A. Schultz's April 16, 2013 restrictions, instructing Plaintiff to "avoid all lifting, carrying, pushing/pulling, climbing, and stopping/bending" because "the imposed restrictions are not supported by the clinician and/or diagnostic findings of record" and are "not supported by other treating sources." (R. 306).

3. The ALJ accorded "more evidentiary weight" "to the findings of Dr. Powell, an orthopedic surgeon and the consultative examiner than that of [P.A. Schultz's] April 2013 conclusions." (R. 307).

---

[8] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" his limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must assess "the nature and extent of [a claimant's] mental limitations and restrictions and then determine . . . [the] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(c).

4.  The ALJ assigned "little evidentiary value" to a note from Nurse Meyers that states "[Plaintiff] meets the criteria for permanent disability" because this opinion is on an issue reserved for the Commissioner and cannot be made by a medical or other source. (*Id.*).

5.  The ALJ gave "no evidentiary value" to a "Certificate of Disability or Handicap" signed by Nurse Meyers because "the conclusions reached of 'disabled' is an issue reserved to the Commissioner." (R. 308).

6.  The ALJ accorded "limited evidentiary value" to consultant examiner Dr. Lorensen's opinion because "no basis for limited lumbar spine range of motion [was] identified." (R. 308-09).

In assessing Plaintiff's RFC, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b),[9] "except she can only lift/carry and/or push/pull up to 15 lbs. frequently with the left (non-dominant) arm," "can occasionally reach overhead with the left arm," "is able to use the right (dominant) arm without limitation," and "has no restriction in handling, fingering and/or feeling with either upper extremity, and has no limits reaching with her right (dominant) upper extremity." (R. 304). Additionally, Plaintiff "is able to sit, stand, and/or walk without limitation during the 8-hour workday." (*Id.*).

### 3.    Steps Four and Five

At step four, the ALJ determined that Plaintiff had past substantial gainful activity at the SPCA, which she left because "of the heavy lifting required." (R. 309). Therefore, the ALJ found that Plaintiff was "unable to perform past relevant work as actually performed." (*Id.*).

At step five, relying on VE Atkinson's testimony, the ALJ found that "considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that

---

[9] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

exist in significant numbers in the national economy that [Plaintiff] can perform." (R. 310). Such jobs included "information clerk," "cashier II," and "officer helper." (*Id.*). The ALJ determined that "the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles and there is no conflict with lifting of no more than 15 lbs., which would allow for 10 lbs. with either arm, a combined lifting capacity with bilateral use of arms." (*Id.*). Accordingly, the ALJ concluded that a "finding of 'not disabled' is . . . appropriate." (R. 311).

## III.   DISCUSSION

### A.   Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than a mere scintilla.' It means such *relevant* evidence as a *reasonable mind* might accept as adequate to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court can reject the facts that the ALJ found "only if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

### B.   Analysis

Plaintiff argues that the Commissioner erred in four ways when denying her claim. Specifically, she claims that: (1) the Commissioner failed to "properly evaluate Plaintiff's credibility and subjective complaints of disabling symptoms;" (2) the Commissioner

"erroneously substitute[d] her own judgment for competent medical opinion;" (3) the Commissioner fail[ed] to properly assess Plaintiff's Residual Functional Capacity;" and (4) the Commissioner failed "to properly consider an award for a closed period of disability from June 22, 2012 until October 1, 2014." (Dkt. 10, at 10-17).

### 1.    Plaintiff's RFC

Plaintiff argues that "the Commissioner failed to properly assess Plaintiff's Residual Functional Capacity" by disregarding portions of properly submitted medical opinions, and that the RFC is not supported by substantial evidence. (Dkt. 10, at 18-20).

Plaintiff argues that the ALJ "incorrectly disregarded Plaintiff's limitation regarding her shoulder impairment and neck impairment offered by two separate medical analyses." (*Id.*, at 18). Plaintiff cites to P.A. Schultz's April 16, 2013 medical report, with a diagnosis of left shoulder complex labral tear, which restricted Plaintiff to no lifting or carrying, (R. 275), and P.A. Schultz's August 16, 2013 medical report, with a diagnosis of cervical degenerative disc disease, which restricted Plaintiff to lifting or carrying 15 pounds. (R. 276). Plaintiff argues that "the second set of restrictions are clearly intended to pertain to *bilateral* impairments from Plaintiff's neck DDD [degenerative disc disease]" which "obviously includes difficulties with Plaintiff's *right upper extremity* as well." (Dkt. No. 10, at 16) (emphasis added).

Between the April 2013 diagnosis of "left shoulder complex labral tear," and the August 2013 diagnosis of "cervical degenerative disc disease," Plaintiff began treating with P.A. Schultz for neck pain, in addition to her shoulder issues, and requested an evaluation of her cervical spine "to see if it is contributing to her *bilateral* shoulder difficulties." (R. 251) (emphasis added). An X-ray revealed "diffusive degenerative changes" of the entire cervical spine, and Plaintiff was diagnosed with "degenerative joint disease of the cervical spine." (*Id.*). An August 22, 2013 cervical spine MRI showed "a broad based disc protrusion at C6-7 with cranial extension." (R.

26

278). Shortly after, Plaintiff treated with Dr. Wainberg for her cervical spine pain, who recommended a course of "cervical epidural injections," (R. 287), and eventually considered a surgical consultation if those were not effective. (R. 503). Neither P.A. Schultz's August 2013 restrictions nor Plaintiff's medical records indicate that the lifting restriction was only for Plaintiff's upper left extremity.

The ALJ did not explain why the Plaintiff's neck impairment did not warrant a bilateral restriction. This omission is especially troubling because this was an issue that the Appeals Council directed the ALJ to resolve on remand. (R. 394). Specifically, the Appeals Council noted that "if the claimant is found to be restricted in lifting and carrying only with her left arm, then further explanation as to why her neck impairment does not warrant a bilateral restriction is warranted." (R. 394). The ALJ found that Plaintiff's neck impairment was severe, and adopted the 15-pound restriction in P.A. Schultz's August 13, 2013 medical report, based on the neck DDD diagnosis, yet failed to explain why she limited the lifting restrictions in the RFC to only the left arm. The ALJ's conclusion that Plaintiff "has full use of her right (dominant) upper extremity" because "there is no medical evidence that she has a medically determinable impairment related to her right upper extremity during the period(s) in issue that would limit her ability to use her right upper extremity," (R. 305), ignores the fact that it was the neck DDD diagnosis that supported P.A. Schultz's August 13, 2013 restrictions. "The RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations." *Klimek v. Colvin*, No. 15-cv-00789, 2016 WL 5322022, at *9, 2016 U.S. Dist. LEXIS 129804, at *25 (N.D.N.Y. July 21, 2016), *adopted sub nom. Klimek v. Comm'r of Soc. Sec.*, No. 15-cv-789, 2016 WL 5256753, 2016 U.S. Dist. LEXIS 129491 (N.D.N.Y. Sept. 22, 2016).

In formulating the RFC, the ALJ accorded "significant evidentiary weight" to Dr. Wainberg's statement that Plaintiff should "continue with her current activity restrictions, which would correlate with the August 2013 assessment from P.A. Schultz limiting [Plaintiff] to lifting/carrying no more than 15 lbs. with her left upper extremity." (R. 306). Even crediting this conclusion that Dr. Wainberg was relying on the August 2013 assessment, this does not provide any more support for the RFC because, as discussed above, the record does not indicate that the August 2013 restrictions were only limited to Plaintiff's upper left extremity. The ALJ noted, in addressing Dr. Wainberg's treatment notes, that "there is no evidence whether this limitation in [sic] permanent or bilateral." (R. 307). To the extent the ALJ discounted Dr. Wainberg's opinion regarding bilateral limitations without attempting to discover whether there were clinical findings to support it, she had a duty to inquire further. *See Brooks v. Acting Com'r of Soc. Sec.*, No. 12-CV-5059, 2014 WL 1013846, at *2, 2014 U.S. Dist. LEXIS 33707, at *5 (S.D.N.Y. Mar. 14, 2014) ("The ALJ discounted [the examining psychiatrist's] observations as 'not supported by any objective clinical findings' without attempting to discover what, if any, clinical findings supported the examining psychologist's [sic] judgment."); *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) (holding that where meaning of doctor's "mild degree" and "intermittent" findings were left to "ALJ's sheer speculation" that "the ALJ likely should have contacted [the doctor] and sought clarification of his report"). The ALJ's conclusion, in the RFC, that Plaintiff is able to use the right arm without limitation is not supported by substantial evidence.

The ALJ's RFC findings are not saved by noting that there are jobs in the national economy Plaintiff can perform which do not require lifting greater than 15 pounds, as this is unsupported by either the vocational expert's testimony or the Dictionary of Occupation Titles ("DOT"). The ALJ noted that three jobs, "information clerk," "cashier II," and "office helper,"

had "no conflict with lifting of no more than 15 lbs., which would allow for 10 lbs. with either

arm, a combined lifting capacity with bilateral use of arms." (R. 310). Yet in his testimony, VE

Atkinson testified that all three jobs were categorized as "light work" which requires "the ability

to do bilateral lift with occasionally up to 20 pounds" "so the combined lifting capacity to get to

20 would be ten pounds with each arm for bilateral lift." (R. 332). VE Atkinson testified that the

job of "information clerk" does not require "lifting more than ten pounds," but never testified

that "cashier II" or "office helper" had any lifting or carrying requirements other than those of

light work. (R. 333). The DOT also notes a "strength" requirement of "light work," requiring

"exerting up to 20 pounds of force occasionally" for both the "cashier II" and "office helper"

jobs. *See* Dictionary of Occupational Titles, Cashier II, Code 211.462-010; Officer Helper, Code

239.567-010.

While VE Atkinson testified that according to the Bureau of Labor Statistics, the national

full-time employment estimate for "information clerk" is 973,508 jobs, this number includes

"groups of occupations which may differ in skill level and physical demand level" and therefore

is not representative of only jobs Plaintiff could actually perform. (R. 331-32). The national full-

time employment estimate as published by SkillTRAN, which "has done additional research to

provide DOT specific estimates," is 1,609 jobs. (*Id.*). One occupation with only 1,609 jobs

available nationally is not a significant number, and therefore the ALJ has not sufficiently shown

that Plaintiff can perform other work in the national economy. *Beltran v. Astrue*, 700 F.3d 386,

390 (9th Cir. 2012) (holding that 1,680 jobs nationally is not a significant number); *Hamilton v.

Commissioner of Social Sec.*, 105 F.Supp.3d 223, 231 (N.D.N.Y. May 13, 2015) (holding that

5,160 jobs across three occupations is not a significant number); *compare with* McIntyre v.

Colvin, 758 F.3d 146, 152 (2d Cir. 2014) (exclusion of non-exertional limits in RFC was

harmless error as they were included in hypothetical presented to vocational expert); *Kenyon v. Comm'r of Soc. Sec.*, No. 16-cv-0260, 2017 WL 2345692, at *5, 2017 U.S. Dist. LEXIS 81867, at *14 (N.D.N.Y. May 30, 2017) ("any error to include environmental limitations in the RFC determination would be harmless error because the positions identified by the vocational expert do not require exposure to atmospheric conditions such as dust, fumes, and gases").

Accordingly, the Court reverses the ALJ's decision based on the lack of substantial evidence to support her RFC determination.

### 2.      Remaining Arguments

Because Plaintiff's RFC is not supported by substantial evidence, remand is required and the Court does not reach Plaintiff's remaining arguments.

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED,** and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Decision and Order;

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: October 7, 2020
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge